JAMES B. BROWN, APPELLANT, VS. THE FLORIDA SOUTHERN RAILWAY COMPANY, APPELLEE.

THE FLORIDA SOUTHERN RAILWAY COMPANY, APPELLANT, VS. JAMES B. BROWN, APPELLEE.

1. An original incorporator in The Florida Southern Railway Company, first known as The Gainesville, Ocala and Charlotte Harbor Railroad Company, was not as such, independent of a contract with the Directors of the company, entitled under the charter of the corporation, on the common law controlling the subject, to a proportion of the stock, to be determined by the number of original incorporators named in the articles of incorporation.

2. A grant of land by the State of Florida to a corporation having power to make contracts for the purpose of accomplishing corporate purposes is not a grant to the original incorporators signing the articles authorized by the general law of this State in the proportion in which they have subscribed for stock, nor does it authorize a division or an allotment of the land to the original incorporators.

3. Stock is originally acquired in a corporation by a subscription therefor. This subscription is a contract defined and regulated by the organic law of the corporation. An incorporator is not entitled to stock as a mere gratuity. He can only acquire it by purchase or by subscription therefor, by which he contracts to pay calls and assumes the other liability to creditors and the company which such relation imposes.

Appeal from the Circuit Court for Alachua county.

The bill of complaint treats The Florida Southern Railway Company (the defendant) as the successor of The Gainesville, Ocala and Charlotte Harbor Railroad Company, praying process against "the defendant, The Florida Southern Railway Company, formerly The Gainesville, Ocala and Charlotte Harbor Railroad Company." The Gainesville, Ocala and Charlotte Harbor Railroad Company was incorporated under the "act to provide a general law

for the incorporation of railroads and canals," approved February 19, 1874, Ch. 1987, Laws of Florida.

Sections 1, 2, 3 and 5, of the act of March 4, 1879, granting lands to The Gainesville, Ocala and Charlotte Harbor Railroad Company (Ch. 3167, Laws of Florida) are as follows:

Sec. 1. That the State of Florida hereby grants to the Gainesville, Ocala and Charlotte Harbor Railroad Company the alternate sections of the lands granted to the State of Florida by the United States under act of Congress of September 28th, 1850, lying on each side and within six miles of a line of railroad to be constructed by said company, to commence at Lake City, in Columbia county, and run in a southerly direction through or near Gainesville, in Alachua county, Ocala, in Marion county, Leesburgh, in Sumter county, and Brooksville, in Hernando county, to the waters of Tampa bay, with one branch from some point in Sumter county through or near Bartow, in Polk county to the waters of Charlotte Harbor, in Manatee county, and another branch to Palatka, in Putnam county; *Provided, however,* The said company shall comply with the provisions of the act entitled "An act to provide for and encourage a liberal system of internal improvements in this State," approved January 6th, 1855, and the amendments thereto, as to the manner of constructing the roads and drainage; *Provided, however,* That nothing herein shall prevent such company from adopting such gauge as it may choose.

Sec. 2. That if the said company shall so amend its charter as to authorize it to construct any part of the line mentioned above and not covered by its charter, then the said company shall be entitled to, and the State hereby grants, the alternate sections within the limit of six miles aforesaid of and along the line of such road, branches or extensions, on the terms and conditions aforesaid.

Sec. 3. That upon the completion of the grading and laying on the cross-ties of ten miles of said road, its branches or extensions, the title to the said alternate sections opposite said ten miles of road so graded and furnished with cross-ties shall vest in said company, and a deed therefor shall be issued by the Trustees of the Internal Improvement Fund to the said company; *Provided, however*, That for every forty miles of road so graded and furnished with cross-ties ten miles shall be completed, ironed and equipped and in operation.

Sec. 5. That the State of Florida hereby grants to said company, in consideration of the greatly improved value which will accrue to the State from the construction of said road, its branches and extensions, ten thousand acres for each mile of road it may construct of the lands granted to the State under said act of September 28th, 1850, said lands to be of those which may be nearest the line of said road, its branches and extensions; *Provided, however*, That the grant of lands made by this section is made subject to the rights of all creditors of the Internal Improvement Fund and to the trusts to which said Fund is applicable and subject under the act entitled "An act to provide for and encourage a liberal system of internal improvements in this State," approved January 6th, 1855, and subject to control, management and sale and application of said Fund and the lands constituting the same by the Trustees of the Internal Improvement Fund for the purposes of said trust under said act; *Provided, however*, That the title to the lands granted under this section is not to vest until they shall be released from the indebtedness existing against said trust fund, it being the purpose of this section to grant the residuary interest of the State in the lands granted by said act of September 28th, 1850, after satisfaction has been made of said indebtedness to the extent or in the quantity

indicated hereby to aid said railroad company; *Provided further, however,* That upon any arrangement being consummated between said company and the Trustees of the Internal Improvement Fund and the creditors of such Fund for the release of such lands from such indebtedness, then the title to such lands as may be so released shall vest in the said company in the proportion of ten thousand acres for each mile of railroad then graded and furnished with cross-ties, or that may thereafter be graded and furnished with cross-ties; *Provided,* That for every forty miles of road so graded and furnished with cross-ties ten miles shall be fully completed and equipped and in actual operation; *Provided further,* That all the lands granted by this act or their proceeds shall be applied to the construction, equipment and operation of said railroads.

The other facts are stated in the opinion.

*Thrasher & Hampton* for J. B. Brown.

1st. The pleadings admit for the purpose of this hearing the proper incorporation of the company.

2d. The act of the Legislature 4th of March, 1879, granted lands only on the condition that certain parties named in the act (among whom is appellant) should become incorporators of the railroad. The terms of the act give to each incorporator equal rights and benefits. Acts 1879, page 121.

3d. The capital stock of the road represented the rights and interests of the stockholders to the land granted, franchises and all property of the corporation; and by the terms of the articles of incorporation each incorporator had equal shares of the capital stock.

4th. The allotment of stock at the meeting in Boston on the 12th day of August, 1880, was a designed and premeditated fraud, as charged in bill, as shown by exhibit of

allotment and their act of advertising lands for sale based upon this gift of lands.

5th. The mode or manner in which fraud is effected is not a matter of much consequence. It is the effect produced to which the court must look in order to see if the result is the consequence of the act complained of. 2 Fla., 508.

6th. Fraud is never presumed, but it may be inferred from facts and circumstances. 10 Fla., 258.

7th. Where a party in a confidential relation to another, as by voluntarily undertaking to aid the other in obtaining possession of his property in the hands of others, takes advantage of this relation and by deception and improper influences induces him to part with it without adequate consideration, a court of equity may lend its aid to obtain redress. 12 Fla., 336; 1 Red. on Railway, 72–3–8; 34 Texas, 125; 40 Cal., 20, 25.

8th. The relations of Brown as an original incorporator, when taken in connection with the legislative provision, are such as to require good faith and fair dealing in every movement between him and the corporation, of which he is part owner and contractor. The corporation is a trustee to protect the rights of the individual members. By reposing this trust in the corporation it is bound to execute the trust with proper diligence and care. 10 Amer. L. R., 9; 21 Wall., 616; 50 Ill., 138; 2 Story's Eq. Jr., par. 954–5, 7th Ed.; 2 Daniels' Chan. Prac., 1650–1–2, 1661–4–5.

9th. Appellant alleges as a basis for this fraud, one Whitney, defendant, arrogated to himself the right to sell out the franchise and rights of the corporation, and did so through the fraudulent movement of a transfer from himself to *himself and others*, to-wit: Isaac Taylor, C. A. Boardman, still they, after this, fearing this monstrous assumption would fail in law, sought out and obtained appellant's power of

attorney to act for him in this distribution of stock 12th of August, 1880. The sale of Whitney to himself and others occurring the latter part of year 1879. One partner cannot sell to himself. 57 Barbour, (N. Y.) 127.

10th. When equities are sworn off it is not of course to dissolve injunction. In this case the equities were not sworn off. 6 Fla., 533 ; High on Injunctions, 450, 771, 767.

11th. A person holding power of attorney can act within due bounds of his authority only, any act beyond the power expressed is null and void, and not binding upon the principal, and an act violative of an express prohibition is fraudulent and void. And the charge is made in the bill that all these defendants knew the full extent of Francis' powers as appellant's agent, and that all the others confederated with Francis on the 12th of August, 1880, to consummate the fraud on appellant. 12 Amer. L. R., 441 ; 1 Amer. L. R., 164 ; 6 Amer. Law R., 207.

12th. When two or more persons have a common interest in property equity will not allow one to appropriate exclusively to himself. 21 Wall., 616.

13th. The grant or gift of the stock (capital) to Candler, Boardman, Whitney and Taylor was without consideration even if they had been equal owners with other incorporators at time of alleged fraudulent allotment. The capital stock was representative of the value of the lands, franchises and other property of the road, and this gift or grant of stock was fraudulent of appellant's interests or rights in and to his share of the capital stock because of want of consideration.

14th. The fraud in this railroad corporation will be treated by equity just as though it were a private copartnership enterprise.

15th. If appellant had no interest in the stock to be

allotted, why the importuning him for his power of attorney, and when obtained what power did Francis and his confederates have to entirely do away with appellant's interests and give it into hands of strangers, without consent of owner or consideration therefor ?

16th. After the fraudulent allotment (which was an effort to deprive appellant of all his rights, except those obtained prior to 12th of August, 1880,) Francis and others of those present at the allotment told Brown that he was entitled to one-third of Candler's stock, which was $113,000 worth of stock, and promised to arrange matters so as he, Brown, would receive that amount, but finally declined. So the prime movers in the fraud acknowledged the wrong perpetrated on appellant, and agreed to repair it, and afterwards recalled their promise to make amends. They declare now that appellant shall have no more stock in said road and bill so alleges. High on Receivers, Secs. 4 and 366 ; Kerr on Receivers, Secs. 8, 9, 10; 18 Grattan, 819 ; Green's Brices Ultra Vires, 671 to 676, inclusive, and notes ; 41 Ga., 454.

17th. The bill also alleges that at time stock was allotted, to-wit: 12th August, 1880, all of incorporators, or those entitled to stock, were not represented. J. E. Young, J. W. Hendry, D. Hughes, F. A. Hendry and J. E. Lipscomb were not present, parties named in the act.

18th. For the purposes of this argument the demurrer admits the allegations of the bill to be true, and it sets forth positive violations of appellant's rights. Now what are the objects and purposes of an injunction ? 12 Fla., page 100.

As to appointment of a receiver see High on Receivers, Secs. 4 and 366 ; Kerr on Receivers, 8, 9, 10 ; 18 Gratton, 819 ; Green's Brices Ultra Vires, 671 to 676, inclusive, and notes ; 41 Ga., 454.

The charges of danger, fraud and irresponsibility are made and alleged against defendants. 5 Cal., 496 ; 11 Ga., 597 ; 22 Ill., 79, 84 ; 9 Gill, (Maryland) 472, 477, 478 and 480 ; 1 Maryland Chancery, 489.

*Taylor & Sanchez* for Florida Southern Railway Company.

That the court below had a right to dissolve the injunction upon motion simply before the coming in of the answer of the defendant where the bill upon its face was wanting in equity. High on Injunctions, §880 ; Kneedler vs. Lane, 3 Grant's Cases, 523.

If it can be shown that there was and is no equity in the complainant's bill, then the court was right in dissolving the injunction ; and was also right in refusing to *reinstate* that injunction ; and the introduction in the shape of exhibits of any amount of matter *aliunde* the bill itself, upon a motion to reinstate an injunction improperly granted upon a bill wanting in equity, will not help that defective bill. If the bill was wanting in equity, then the defendant's demurrer thereto was well taken and should have been sustained, and the court erred in overruling it. The real and only question then that presents itself for decision by this court, so far as the defendants are concerned, is whether or not there is any equity in the complainant's bill. The decision of this question disposes effectually of both appeals. Is there any equity in the bill ?

The complainant's right to an injunction, such as he prays for in his bill herein, depends entirely *upon his right to demand stock and lands* as claimed by him in his bill ; if he has no legal right to " *stock or lands,*" they being the very gist and *subject-matter* of his bill, then he has no right to enjoin, or otherwise interfere with the affairs of the company. " Stock and lands " being the sole subject-matter of

his bill, if the complainant fails to show that he has any interest in this stock and lands, then his bill is demurrable for want of interest in that subject-matter. Story's Eq. Plead., 6th Ed., §503, and authorities there cited; High on Injunctions, p. 8, §9; 35 Md., p. 15.

If the appellant is a legally incorporated company, with its full quota of officers regularly and completely organized, and, as the bill alleges, is going ahead building a railroad, the object for which it was created, and is in other respects carrying forward and exercising its legitimate corporate powers, as only a *completely organized* corporation can do, then the complainant's boasted office and rank of an " *original incorporator* " or " *promoter* " of the enterprise has ceased and determined; it is *functus officio ;* otherwise what becomes of the doctrine of perpetual succession in corporations; and what would become of the right of *bona fide* subscribers to the stock of said corporation, conferred upon them by the statute of our State, to " *vote at elections* " for officers that are necessary for the perpetuation of the institution, and by their votes changing such officers from time to time; and surely it cannot be contended that Mr. Brown would always be voted for at these elections of officers, and kept perpetually a member of said corporation simply because his name was on the original articles of incorporation. His position or office of an original " *organizer* " of the institution clearly ceases the moment the company becomes completely organized and in working order. On the other hand, if the company is not yet legally organized or incorporated, he, as an original promoter of the scheme, has no powers or rights, solely, as an incorporator, except in concert with the other original promoters of the enterprise, and then only in a direction looking to the *organization*, simply, of the corporation. Certainly the corporation, as such, nor the promoters or organizers of it, can acquire any rights un-

til it comes completely into existence, a full-fledged corporation. According to the allegations in the complainant's bill itself, the company is incorporated *de facto*, and has been also recognized by the State authorities as such ; and the complainant recognizes its autonomy by suing it as a corporation, by its corporate name, in a court of justice. If it is incorporated, the incorporators have ceased to exist as such ; and its integrity as a corporation *de jure* can only be called in question by a proceeding in the nature of a *quo warranto*, and not by a collateral proceeding. Pierce on Railroads, 27 ; 22 Ohio St., 354; 9 R. I., 513 ; 55 Barb., 344 ; 48 Vt., 266 ; 20 La. An., 489 ; 15 Wall., 478 ; Angell & Ames on Corp., Ch. 21 ; 24 Vt., 465 ; 9 Wend., 351 ; 4 Johns., Ch. 379 ; Ang. & Ames on Corp., 664–5 ; 10 G. & J., 346 ; 104 Mass., 378.

Neither can the acts nor title of its officers be questioned collaterally in a suit at law or in equity. Pierce on Railroads, page 26 ; 5 Stewart, N. J., 236 ; 55 N. H., 48 ; 12 N. H., 205 ; 10 N. H., 58 ; 39 Maine, 587 ; 68 Maine, 31 ; 65 Maine, 536 ; 2 Doug., Mich., 124 ; 75 Ill., 113 ; 70 N. C., 348 ; 35 Mo., 13 ; 15 Ohio State, 225 ; 34 Ohio St., 46, 58 ; 13 Ind., 404 ; 2 Ken. Com., 295.

Nowhere in either the original or amended bill does the complainant, J. B. Brown, allege that he ever *subscribed for any stock*, or that he ever attempted to subscribe for any, or that he ever paid for or *contracted* for any stock, or that he was ever promised any stock by any person or persons having competent authority to make such promise, or otherwise ; neither does he state any fact or facts in his bill that go to show that he is entitled to any stock whatever. He bases his *entire claim* to " stock and lands " upon the farcical fact " that he is one of the twelve parties named in the original articles of incorporation," and in the act granting lands to said company.

31

Upon this state of facts, patent upon the face of his bill, the complainant, J. B. Brown, is no more entitled to capital stock than any other gratuitous solicitor thereof, and for the same reasons he is not entitled to the remotest interest in any land that may be granted to the corporation; and has no concern whatever in any disposition of it, that the company may see proper to make. His only right as an incorporator, or " original promoter " of the enterprise, is that of acting with, and as a member of the Board of Incorporators " in properly *organizing* " the company.

After the company is once completely organized it may be truly said that no one is a " member of the corporation " except such as are *bona fide* stockholders. Our statute, under the provisions of which this corporation came into existence, makes it so, since it provides that no one can be elected to the office of President, Director or to any other office in the corporation, except he be a stockholder; and the same law provides that the right of a party to vote at elections shall be regulated by his ownership of stock, to-wit: by the number of shares he owns, &c. Laws of Florida, 1874, Ch. 1987; Laws of Florida, 1879, Ch. 3165.

The only mode left, then, by which the complainant, J. B. Brown, can become a member of this corporation is to become the owner *bona fide* of stock thereof; and the only mode by which he or anyone else can become the owner *bona fide* of stock is by " *subscribing and paying* " therefor; and this he does not pretend in his bill to have done, neither does he even offer to do so in his bill.

Mr. Justice Hunt thus states the law, and it is as applicable to *incorporators* as to Directors: " The capital stock of a moneyed corporation is a trust fund, of which the Directors are the trustees. It is a trust to be managed for the benefit of its shareholders during its life, and for the benefit of its creditors in the event of its dissolution. This

duty is a sacred one, and cannot be disregarded. Its violation will not be undertaken by any just-minded man, and will not be permitted by the courts. The idea that the capital of a corporation is a foot-ball to be thrown into the market for the purpose of speculation is a modern and wicked invention. Equally unsound is the opinion that the obligation of a subscriber to pay his subscription may be released or surrendered to him by the trustees of the company. This has often been attempted, but never successfully. The capital paid in and promised to be paid in is a fund which the trustees cannot squander or *give away.* They are bound to call in what is unpaid, and carefully to husband it when received." Upton vs. Trebilcock, 21 U. S., 47 ; Sanger vs. Upton, Ib., 60 ; Webster vs. Upton, Ib., 69 ; Taggart vs. West., Maryland R. R. Co., 24 Md., 563 ; Sawyer vs. Hoag, 17 Wall., 610 ; Ogilvie vs. Knox Ins. Co., 22 How., 380 ; Graff vs. Pittsburg R. R., 31 Pa. St., 489 ; Sturges vs. Stetson, 1 Biss., 250 ; 56 N. H., 262 ; 47 Vt., 313 ; 57 N. Y., 133 ; 3 Sandf. Chy., 499 ; 33 N. Y., 297 ; Hughes vs. Antietam Mfg. Co., 34 Md. St., 16 ; 42 Iowa, 478 ; 46 Mo., 248 ; Green's Brice's Ultra Vires, 146, 147, 149 ; Green's Brice's Ultra Vires, 2d Am. Ed., Chap. IV. ; Field on Corporations, p. 138, Sec. 123 ; State vs. Morristown Fire Ins. Co., 23 N. J. L., 195 : Pierce on Railroads, 45 ; Melvin vs. Hoitt, 52 N. H., 61, 67 ; 8 Peters, 281 ; 15 How., 304 ; 18 How., 480 ; 6 Wall., 277 ; 8 Ga., 486 ; 59 Ala., 139 ; 85 Pa. St., 25 ; 82 N. C., 523 ; 42 Conn., 583 ; 13 Blatch., 134 ; 17 Wall., 610 ; Chubb vs. Upton, 95 U. S., 665 ; Hatch vs. Dana, 101 U. S., 205 ; Green's Brice's Ultra Vires, 152 ; Note (C) and authorities there cited ; 14 Wend., 20 ; 4 Biss., 365 ; 3 Biss., 417 ; Upton vs. Burnham, 8 Biss., 520.

As to who is a stockholder, see the leading case of Franklin Glass Co. vs. Alexander, 2 N. H., 380 ; and see Vol. 9

American Decisions, published by Bancroft & Co., of California ; Notes at p. 96 ; Field on Corporations, 92 and 93 ; Highland Turnpike Co. vs. McKean, 11 Johns., 100 ; 9 Johns., 218 ; 8 S. & R., 219 ; 17 Ohio, 407 ; 8 Ala., 586 ; 12 Conn., 499 ; 5 Gill, 484.

The complainant in his bill sets up as a reason why he is entitled to stock and to the lands of the company, " that the grant of land would never have been made had it not been for his exertions," &c., &c. Now, what sort of " exer. tions " or services could have been rendered upon the part of this complainant to " procure a land grant," except that it must have been " lobby services ?" If these were the services performed by him he cannot claim stock for them, as such services are against public policy, and any contract made therefor is not binding on the parties, but void. Pierce on Railroads, 512, 513 ; Marshall vs. Balt. and O. R. R. Co., 16 How., 314 ; Trist vs. Child, 21 Wall., 441.

So that any such services rendered by him cannot be said to be a *bona fide* payment for stock, or any consideration upon which any stock could be " allotted " or given or " voted " to him.

The laws of Florida, under which this company was organised, alike require *payment* for stock when it makes provision for the " making of calls," and for the " forfeiture of *subscriptions* " when the calls for *payment* of subscriptions are not complied with.

If, therefore, the Directors did in fact " *vote* " to J. B. Brown, the complainant, $50,000 worth of stock without his having regularly *subscribed* therefor, or without his having *paid* therefor, or in some manner (not disclosed by his bill) obligated him *to pay* therefor, they did something that was entirely out of their power to do, and something that was a fraud upon the rights of *bona fide* stockholders ; and such action is void. P. 479, Note 10, 2d Redfield on

Railroads; Field on Corp., pp. 161, 162; Green's Brice's Ultra Vires, p. 142; Note, (A) Ib., 143; Sturgess vs. Stetson, 1 Biss., 246, 255; 20 Conn., 188; 53 Barb., 513, 578; Fisk vs. Chi. R. I. & Pac. Ry., 46 N. Y., 325.

Neither will the courts of the country undertake to compel the perpetration of any such unauthorized action on the part of the company.

The complainant failing, therefore, to show himself to be a stockholder, or entitled to be a stockholder, has no interest in the main subject-matter of his bill, and must consequently fail in obtaining his main relief prayed.

The complainant in the prayer of his bill does not ask that any of the land granted to the company shall be given to him, but in the *stating* part of his bill he does claim to be entitled to an interest in the land, and fears a disposition thereof, &c., and under the prayer for general relief might demand it. In the bill he avers that the title to the land is, under the law, to become vested (not in him but) "*in said company*" upon the happening of the contingency of building the road, and he admits that the company has built the road, and that the State officers avow their intention to "*deed the land to the company*" if it shall appear that the law has been complied with by the company. Certainly no argument can add force or emphasis to the baselessness of the complainant's assumption, as is shown by his own pleading. He says distinctly that *by the law* the land was to vest *in the company* upon the happening of a certain contingency. He admits the contingency has happened, and then prays the court to overturn and annul the plain provisions of the law which he himself points out, and asks the court that, as a reward to the company who put their money out to build this road, these lands may be parcelled out among twelve persons, who were named in the law for the purpose simply of organizing and incorpor-

ating the company according to law, but who, according to the averments of the bill, did not act as incorporators at all, but stood idly by, neglecting their trust, and allowed the company somehow to drift into the control of a lot of non-residents from Boston, who appropriated all the capital stock (*gratuitously*) which was left after the prior *gratuitous* appropriation had by complainant and his confederates at the time he bagged his boasted $50,000.

And, again, the complainant does not come into the court with clean hands. He admits that while he was an incorporator there was " *voted* " to him, which he did not scruple to appropriate, for no consideration, and certainly without any authority, $50,000 worth of stock, and with no proffer to restore the same or to pay for it ; and he now asks the court to be used as an instrument to enable him to misappropriate a still larger amount.

A court of equity is not constituted for any such purpose. It does not matter how malign the actions or intentions of the defendants have been or are, this court will not extend its aid to one who confesses himself to have been *in pari delicto*, and especially when the relief sought involves the perpetration of a gross fraud, both upon the law and upon the legitimate stockholders and creditors of the company.

A suit for the relief sought in this case must be brought in the name of the corporation itself, and it is only upon its declination or fraudulent refusal to act that the complainant, by proper authority to sue, is authorized to do so. 8 Wall., 64 ; 1 Woolw., 400 ; 24 Me., 9 ; 26 Conn., 456 ; 6 Allen, 52 ; 18 Wall., 626 ; 11 Blatch., 385 ; 1 R. I., 312 ; 26 Barb., 657 ; 3 Paige, 222 ; 30 Barb., 157 ; 10 Bosw., 677 ; 58 Ga., 316 ; 35 Md., 15, a leading case ; 6 American, 350.

If we are correct in our views the complainant is entitled to no relief whatever, no matter how wrong, fraudu-

lent or improper the acts of the defendants may have been ; but if he was entitled to relief, it nowhere appears from his bill that a court of law is adequate to afford him relief. If his rights were invaded it was so done, according to the averments of his bill, by the concurrent actions of the ten parties from Boston, of whom seven thereof were Directors of the company, and by Francis, (the latter acting for complainant under his power of attorney.)

If complainant has any rights to any kind of relief at all, an action of *tort* will lie against the Directors who violated their trust by giving away the capital stock of the company, and against Francis also, who, it is alleged, violated his trust towards complainant; and if the Directors received money from any person as a consideration for stock, to which the complainant was legally entitled, then *assumpsit* will lie against them therefor. Simons vs. Vulcan Oil Company, 61 Pa. St., 202.

And if Candler received any stock to which complainant was legitimately entitled then complainant can maintain an action of *trespass on the case* at law against him for its value.

The bill must therefore fail for want of equity jurisdiction, because the remedy is adequate at law, and because the complainant does not show by his bill that he is in any manner interested in the "stock and lands" that are the subject matter of his bill.

MR. JUSTICE WESTCOTT delivered the opinion of the court:

In this case an injunction granted in the Circuit Court upon bill and exhibits was subsequently dissolved, and from this order, and an order refusing to reinstate the injunction, Brown appeals to this court. There was a demurrer to the bill by the company, which being overruled

the company appeals. This opinion covers both appeals. The bill concerns two subjects: the capital stock of the company, in which Brown was an incorporator, and a grant of land made by the State to the company. The allegations as to each subject are not, as they should be, placed together in the bill, but we find allegations as to the stock followed by statements as to the land, and then statements as to stock. Thus framing a pleading serves no other purpose than to embarrass those whose duty it is to examine and analyze it.

We first discuss the case as to the stock. As to the stock, the plaintiff sets up in his bill, original and as amended, and in exhibits a part of the bill, that the plaintiff, Brown, N. R. Gruelle, B. F. Matthias, H. C. Howard, G. B. Phinney, James Hunter, George H. Packwood and Thomas C. Lanier, on the 10th of May, A. D. 1876, signed articles of association as incorporators of the Gainesville, Ocala and Charlotte Harbor Railroad Company; that the name of the company was subsequently changed to the Florida Southern Railway Company, and that the capital stock of the company was fixed at $3,250,000; that the above-named parties subscribed for shares " one thousand dollars " each, and were declared Directors. On the 6th of May, 1879, we find from an exhibit showing a meeting of the Directors that Brown, Phinney, Whitney, Matthias and Gruelle were five of them, and that Brown was Vice-President of the Company.

Plaintiff alleges that in May, 1879, " stock was voted by the corporation five hundred shares each to the following corporators: H. C. Howard, G. B. Phinney, B. F. Matthias, H. C. Whitney, N. R. Gruelle and J. B. Brown, each 500 shares now valued at $50,000 ;" that in December, A. D. 1879, the company and himself agreed to give ten parties of Boston, Massachusetts, viz: Charles Francis, A. H.

Bachellor, Edward Avery, Charles Whitney, D. N. Skillinger, G. B. Nichols, W. R. Duper, J. R. Hall, John M. Candler and A. D. S. Ball, each $150,000 worth of stock, and that seven of their number might be elected Directors " if they would raise money enough to build the road," and that this arrangement was agreed to and carried out; " that in August, 1880, these ten parties from Boston, together with H. C. Whitney," (who held, as before stated, five hundred shares of stock valued at $50,000,) " divided the balance of stock unappropriated by said company to-wit: stock to the amount of $2,856,000, in the following manner: $150,000 each to the ten Boston parties before named, making $1,500,000, and *three hundred and thirty-nine thousand dollars* to each of the following named parties: H. C. Whitney, C. A. Boardman, Isaac Taylor and W. L. Candler, making $1,356,000, which plaintiff alleges " consumed all of the unappropriated stock of said company."

Plaintiff alleges that he never consented to " this distribution of stock " to these four parties; that this distribution was made at a meeting of the ten Boston parties and Whitney; that he was represented at that meeting by Charles Francis, who was authorized to act for him in the distribution of stock with special instructions that plaintiff would not agree to any arrangements made with Boardman, Taylor and Candler, and that the said Francis was only to represent him in the fair and just distribution of the stock of the said corporation among those entitled to receive stock, and affirms that by virtue of his relation as an original incorporator he was entitled to $113,000 worth of stock (in addition to the $50,000 he had already received), which is one-twelfth of the amount left of the two million eight hundred and fifty-six thousand dollars' worth of unappropriated stock after deducting the one million five hundred thousand dollars awarded to the ten parties in Boston.

Plaintiff alleges that he claims this because there were twelve incorporators outside of the ten parties from Boston, and avers that even if Boardman, Taylor and Candler are proper and legitimate corporators, they and H. C. Whitney are not in any way entitled to the large amount of stock received by them, while he, one of the original incorporators, was entirely excluded ; and that should they be entitled to a fair distribution of stock plaintiff would then be entitled to the sum of $90,400 worth of stock, which is the one-fifteenth of $2,856,000 less $1,500,000 for the ten Boston parties. Plaintiff alleges that the failure to allot him his just share of stock was a fraud, and that the principal actors agreed at one time to adjust the stock, but now refuse.

Plaintiff alleges that all of the incorporators were not present at this meeting, personally or by proxy. Plaintiff, in his amendment to the original bill, alleges that, in the latter part of the year 1879, H. C. Whitney made a contract of sale of all of the franchises of the Gainesville, Ocala and Charlotte Harbor Railroad Company to C. A. Boardman, Isaac Taylor and himself, and that they afterwards admitted W. L. Candler, each of the parties paying therefor the sum of one thousand dollars ; that this was done without the knowledge of plaintiff, and that in 1880, when he became aware of it, he notified Francis and Boardman that Whitney had no right to make any such disposition of the franchises of the company ; that notwithstanding such notice, after obtaining the power of attorney to distribute stock, the said parties endeavored to enforce said fraudulent sale, and they continued to recognize and enforce the same to the injury of the plaintiff and the other incorporators. Plaintiff alleges that prior to the holding of the meeting of August, 1880, said Whitney sent to him a power of attorney to sign, which was as follows : " Know all men by these

presents, that we, James B. Brown and N. R. Gruelle, of Gainesville, Florida, hereby constitute and appoint Henry C. Whitney to be true and lawful attorney for us, and in our names and stead to appear at any Directors' meeting of the Gainesville, Ocala and Charlotte Harbor Railroad Company, at any time or at any other meeting, or at any time hereafter, or in any place, and either verbally or by writing, under seal or not, and in our names, places and stead, as fully as we might or could do if personally present doing the same ; to agree and consent to any allotment, division or vesting of title and ownership of, in and to the capital stock of the Gainesville, Ocala and Charlotte Harbor Railroad Company to or in any person or persons, and by any method, and to receive any such stock for us, and to receipt in any mode therefor irrevocably, with full power of substitution, hereby granting unto our said attorney full power and authority to act in and concerning the premises as fully and effectually as we might do if personally present, ratifying and confirming all that our said attorney may lawfully do or cause to be done by virtue of this power hereby granted or intended to be. In witness," &c., &c. The power is dated in August, 1880 ; that he refused to sign said power of attorney ; that soon thereafter Charles Francis telegraphed plaintiff from Boston asking him if he had signed and forwarded the power, and Boardman wrote to him asking him the same question.

Upon these facts and the acts of the parties in distributing the stock the plaintiff charges fraud and combination against him. Plaintiff alleges that he appointed Francis to act for him at said meeting at the instance and request of Boardman, who represented that Francis was a very correct man and would protect plaintiff's interest, and that he empowered said Francis by power of attorney to act for him " *only* in the division of stock." Upon these facts

plaintiff, as against Whitney, Boardman, Francis and Candler, charges fraudulent combination to deprive him of his rights. Plaintiff in his amended bill alleges that the four parties named pretended at said meeting to represent most of the incorporators and the corporation, and that they appropriated to themselves the entire amount of the remaining capital stock of the company without paying any consideration therefor or doing any act that was of any benefit to said corporation.

Then follows a charge that all the *other parties present at the meeting* participated in the fraud of these parties with full knowledge that said Francis was empowered and authorized only to " allot " the unappropriated stock fairly and justly among those entitled thereto. Plaintiff in his amended bill prays that Boardman, Taylor, Candler and Whitney be made parties defendant, and that they may be enjoined from encumbering or disposing of the stock held or claimed to be held by them. In his original bill he prayed that the officers of the company and the company be enjoined from allowing any transfer of the stock of the company or of the individual members thereof; that the company be decreed to convey to plaintiff absolutely and unconditionally, and free from all encumbrances, $113,000 worth of stock.

Reading this bill carefully it will be perceived that the appellant, Brown, bases his whole claim to the relief he asks upon the ground that at the meeting of the company in 1880, at which he had a representative, the acts of the company and its officers then present were in violation of his rights as an original incorporator. These acts all culminated in what he calls distribution of stock. The charter fixes his right as an incorporator, prescribes the method of the organization of the company, and regulates the matter of the capital stock both as to its amount and as to sub-

scriptions thereto after the organization of the corporation. As an original incorporator he signs his name to the articles of association, stating the " number of shares of stock he agrees to take " in the company, and upon filing the articles, affidavits and other matters required to be filed in the office of the Secretary of State, and the issuing the certificate by the Governor, the law provides that "the persons who have so subscribed such articles of association, and *all persons who shall become stockholders in such company,* shall be a corporation by the name specified by such articles of association, and shall possess the powers and privileges granted to corporations and be subject to the provisions contained in this act."

The language " the persons who have so subscribed such articles of association and *all persons who shall become* stockholders in such company " shows that others in addition to those signing the articles and agreeing in the articles to take stock may become stockholders, and the law provides how they may become stockholders. The statute provides that when the articles, affidavits, &c., are filed and recorded in the office of the Secretary of State, "the Directors may, in case the whole of the stock is not before subscribed, open books of subscription to fill up the capital stock of the company in such places, and after giving such notice as they may deem expedient, and may from time to time receive subscriptions until the whole capital stock is subscribed." It is thus seen that after the organization of the corporation the matter of subscriptions to stock is under the control of the Directors in the respects indicated, that as to this matter the right of an incorporator is merged into that of a stockholder, and that a stockholder has no authority to control the matter of subscriptions to stock as against the company, but that the Directors " may receive subscriptions " therefor. At the meeting of the Directors

in Boston the fact that plaintiff had signed the articles of
association of the company gave him no right to demand
at such meeting, either in person or by his representative,
Francis, a conveyance to him by the company " absolutely
and unconditionally, and free from all encumbrances, $113,-
000 worth of stock, nor does the fact that he was an origi-
nal corporator give him the right to enjoin the company
from permitting any transfers of stock. The plaintiff not
only bases his bill upon an erroneous idea as to his rights
as an original incorporator, but it is apparent that he mis-
conceives entirely the relations of the stockholders to the
company and to each other. Subscription to the stock of
a corporation is a contract between the stockholder and the
company by which the person taking stock acquires an in-
terest in the property and franchises of a corporation in the
proportion the stock subscribed by him bears to the aggre-
gate amount subscribed by others, and this interest is con-
trolled by the charter which creates the corporation. Hav-
ing subscribed for stock, the party becomes subject to that
section of the law which provides that " the Directors may
require the *subscribers to the capital stock of the company,*" not
the signers of the articles, " to pay the amount by them va-
riously subscribed in such manner and in such installments
as they may deem proper," and the stockholder contracts so
to do. The plaintiff by limiting the authority of his agent
and representative, Francis, " to act in his name ONLY in
the division of stock," (the small capitals are the plain-
tiff's) did not authorize him to *subscribe* for stock or to
make any contract with the company similar to that of a
subscription to stock. His authority and agency was to
receive a grant of stock absolutely and unconditionally,
which plaintiff claims by virtue of the fact that he was one
of the signers of the articles of incorporation. While the
plaintiff admits knowledge of the time and place of the

meeting, and has an agent there, it was not within the power of the company to do what this agent was authorized to demand or receive, as it was and is beyond the power of the company to make a donation of stock not subject to calls to either an incorporator or stockholder, or any one else. We do not mean to say whether the company might or might not pay for services to the company in stock. That question is not here raised.

The plaintiff makes no case of an application by him to the company to subscribe for stock, and for that reason, even if it was the duty of the company to receive such application and to grant it, he has not placed himself in a position where he can ask the aid of a court of equity to direct the company or its Directors to issue stock to him. For all that appears in this bill he may not be willing to enter into a contract to pay installments upon the call of the Directors which is involved in a stock subscription.

As to the stock claimed to be held by Whitney, Boardman, Taylor and Candler. There are no *facts* alleged here which negative the view that the Directors at the meeting in Boston, at which plaintiff had an agent, did not receive subscriptions for stock to the amount of $339,000 from each of them, and if this be the fact we know of no cause of action which the plaintiff has against the company for such act. The plaintiff made no application for stock, and the Directors, so far as the *facts* are stated in this bill, exercised a power plainly granted to them by the law which defined their powers and duties. The complaint is that these parties received stock " without paying any consideration therefor, or doing any act that was of any benefit to said corporation." Under the charter and under the general law of corporations it is not necessary that the payment of any money or the doing of any act beneficial to the corporation shall precede a subscription to stock. We have al-

ready explained the nature and method of such subscription so far as it is necessary to define it in this case. It is unnecessary to repeat. As to the allegation that plaintiff was defrauded of his rights by the parties present at this meeting—the right which he claims had no existence, and he could not therefore be defrauded of it.

As to the allegation in the amended bill that in the latter part of the year 1879 Whitney made a sale of all the franchises of the Gainesville, Ocala and Charlotte Harbor Railroad Company there is nothing to show that the company recognized such sale, or that it even knew anything of the matter; on the contrary, plaintiff in his bill admits the fact that the company has constructed a portion of its road and is in the active exercise of the franchise to be a corporation and to operate the road as a common carrier, and one of the grounds of complaint is that the company is about to receive a grant of land from the State.

Our conclusion, so far as the matter of the stock of the company is concerned, is that there is no equity in the bill, and that the plaintiff shows no right, as against the company, to any more than five hundred shares of stock; and as to that, he is under obligation to pay calls when made by the Directors.

As to the land—

The allegation as to the stock he holds and his relation as an original signer of the articles of association, need not here be repeated. They go, however, as a matter of course, to make up the case as to land.

Plaintiff alleges that on the 4th of March, A. D. 1879, an act was passed by the Senate and Assembly of the State of Florida *granting to the corporation* the alternate sections of land on each side of the proposed line of road "and ten thousand acres per mile in addition, and that it was provided in said act that said corporation should not be entitled to any of

the benefits of this act or any rights thereunder until J. E. Lipscomb, B. F. Matthias, H. C. Whitney, G. B. Phinney, J. B. Brown, J. E. Young and T. C. Lanier, N. R. Gruelle, J. W. Hendry, D. Hughes and F. A. Hendry, or such of them as are not already corporators in said company, shall become such ;" that upon the completion of the grading and laying on the cross-ties of ten miles of said road, its branches or extensions, the title to said alternate sections opposite said ten miles of road so graded and furnished with cross-ties *shall vest in said company,* and a deed therefor shall be issued by the Trustees of the Internal Improvement Fund to the said company ; that the company claims to have furnished twenty miles of said road from Palatka towards the town of Gainesville, and have demanded that the State Surveyor inspect the same, and the Board of Internal Improvement has ordered an inspection by said Surveyor, and the Board say that if the completion of the twenty miles towards Gainesville comes up to the requirements of the law they will deed the land to the company, as provided by the act, immediately upon a favorable report being filed by the Surveyor ; that the Surveyor was sent by the Board to inspect said road two weeks ago, and he says that he will finish the examination and report within two weeks ; that the completion of the twenty miles from Palatka is in compliance with the law so far as his information and observation extend, and that plaintiff is firmly of the opinion that the Surveyor will report such to be the case within the next day or two, if he has not already done so ; and that the Board of Internal Improvement Fund of the State will make deeds to the company to the lands as provided by law, and the members of said Board openly proclaim that they will do so ; that this twenty miles is all that has been finished of said road, and that the said company started work at Palatka end of
32

Palatka branch of said road, and that the whole line of said road is estimated by said company to be two hundred and ninety-three miles long ; that the land grant from the State is a large and valuable one, and would never have been obtained from the Senate and Assembly of the State of Florida but for the persistent and untiring efforts of your orator; that in a few days, by agreement between the corporation and the Board of Internal Improvement of the State of Florida, deeds will be made to said company to all the lands they are entitled to upon completion of twenty miles of said road, which is a very large quantity ; and that plaintiff is entitled to his share of said land, and he fears and believes that when the company get deeds to this land they will at once hypothecate the said lands or transfer or dispose of the same in some way into the hands of strangers, and thus deprive complainant of his just rights in the premises ; " that he is entitled to his share of said land as an original incorporator of said company ; that the State made him a corporator ; that he accepted the same, and he has never resigned or transferred his right thereto ; that he is. entitled to a share in the land in the proportion of $163,000 of capital stock, his share is, to the total capital stock of said company $3,250,000.  Plaintiff prays that the corporation be enjoined from mortgaging or encumbering the lands which may be deeded to them in pursuance of the land grant enactment," and that the company may be decreed to hold and preserve the land exactly and precisely as it may be deeded to them without change, transfer or hypothecation.  We discover no prayer that the company or the Trustees be decreed to make a title to plaintiff of the land ; the prayer is only to restrain the company from doing anything with it.  These are the facts with reference to which the demurrer is to be considered, except that the statement that the act granting the land

did not provide absolutely that the corporation should not be entitled to the land unless Lipscomb and the others named should become corporators. That clause of the act was followed by a promise to the effect that if any of such persons should die or refuse to become a corporator the fact of such death or refusal should not prevent any rights from vesting under the act.

The company under its charter is authorized to make contracts, and if they see proper to make this land the basis of credit by executing a mortgage upon it, the company has such right. The grant here made is to the company, and it has authority to receive the land. Brown as an incorporator is not entitled to the proportion of the lands claimed. The grant is to the company, not to him.

A grant of land to a corporation with power to make contracts in reference thereto for the purpose of accomplishing corporate purposes is not a grant to the original corporators in the proportion in which they have subscribed for stock in the company organized. The title vests in the company for the purpose of accomplishing the end and object of its creation, and not in the individual stockholder in the proportion that his shares bear to the whole stock for his private benefit and disposal.

To the extent that the corporation here would be enjoined from receiving this land as a means of promoting the construction of the railway and controlling it in its stock interests, to that extent would it be equivalent to a judgment of forfeiture of its rights upon a *quo warranto*.

So far as the land grant is concerned we, therefore, see that there is no equity in the bill.

In the case of the appeal in Brown vs. The Florida Southern Railway Company and others, the orders of the Circuit Court appealed from are affirmed.

In the case of the appeal of The Florida Southern Rail-

way Company and others vs. Brown, the order overruling the demurrer is reversed and the case will be remanded, with directions to enter an order sustaining the demurrer and dismissing the bill.

At the January Term, 1882, at which the above case was submitted, a motion was also made by Brown for the appointment of a receiver to take charge of the railroad and other properties of the company during the pending of the suit.

MR. JUSTICE WESTCOTT delivered the opinion of the court thereon as follows :

In this case the court having determined that there was no equity in the bill, as a matter of course it cannot be made the foundation of a motion for receiver and injunction.

The motion is denied.